IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | Case No. _____ |
| v. | |
| RYAN R. RILEY, | **JURY TRIAL DEMANDED** |
| Defendant. | |

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") alleges as follows:

## SUMMARY

1. This matter concerns a fraudulent investment scheme orchestrated by Defendant Ryan R. Riley ("Riley"), an investment adviser, through purported energy companies he controlled.

2. From in or about January 2014 through in or about September 2019 (the "Relevant Period"), Riley solicited investments in these companies. He obtained over $480,000 from about a dozen individuals, including his advisory clients and other investors. Riley induced them to purchase securities through materially false and misleading statements and omissions about the companies' prospects of engaging in lucrative energy deals.

3. Riley also misrepresented and concealed his misuse of investor and client funds. Contrary to what he told investors and clients, Riley used their funds for personal expenses such as paying his own grocery, restaurant, mortgage, and credit card bills. Riley lost nearly all of the remaining funds through day trading.

4. Instead of disclosing these losses—or revealing to his clients and investors how he had used their money—Riley lied about the energy deals he claimed his companies were undertaking.

## VIOLATIONS AND RELIEF SOUGHT

5. By engaging in the conduct described in this Complaint, Riley violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5], and Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1) & 80b-6(2)].

6. The Commission seeks to permanently enjoin Riley from violating these laws again; disgorgement of ill-gotten gains derived from his unlawful activity, with prejudgment interest; civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)]; an order prohibiting Riley from serving as an officer or director pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)]; and other relief the Court may deem just and appropriate.

7. Unless Riley is restrained and enjoined, he will again engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## JURISDICTION AND VENUE

8. The Court has jurisdiction over this action pursuant to Sections 20(d)(1) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(d)(1) and 77v(a)], Section 27 of the Exchange Act [15 U.S.C. § 78aa], and Sections 209(d) and 214(a) of the Advisers Act [15 U.S.C. §§ 80b-9(d) and 80b-14(a)].

9. The Court has personal jurisdiction over Riley. Riley resides and transacts business in the Eastern District of Virginia and many of his acts and transactions constituting violations of the

Securities Act, Exchange Act, and Advisers Act occurred in the Eastern District of Virginia, where some of Riley's harmed advisory clients and investors also reside.

10. Venue is proper in the Eastern District of Virginia pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)], and Section 214 of the Advisers Act [15 U.S.C. § 80b-14]. Among other things, certain of Riley's transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district, where Riley and some of his harmed advisory clients and investors reside.

11. In connection with the conduct alleged in this Complaint, Riley, directly or indirectly, singly or in concert with others, made use of the means or instrumentalities of interstate commerce, the means and instruments of transportation or communication in interstate commerce, or the mails, or any facility of any national securities exchange, including placing trades using the facilities of any national securities exchange to carry out his fraudulent scheme. Wire transfers were also used to place trades and transfer funds to further Riley's scheme.

## DEFENDANT AND RELATED ENTITIES

12. Riley is a resident of Leesburg, Virginia. He previously held Series 7, 24, 31, 53, 63, 65, and 66 securities licenses, and was associated with broker-dealers registered with the Commission. Riley gave clients investment advice in exchange for fees during the Relevant Period. He was thus an investment adviser under Advisers Act Section 202(a)(11) [15 U.S.C. § 80b-2(a)(11)].

13. At all relevant times, Riley was the sole member, owner, and employee of Green Light Energy, LLC ("Green Light"). Green Light is a Virginia limited liability corporation formed in 2010, purportedly to undertake residential and commercial lighting projects.

14. At all relevant times, Riley was the sole officer, shareholder, and employee of Mustang Oil & Gas, Inc. d/b/a Mustang Resources Inc. ("Mustang"). Mustang is a Texas corporation formed in 2010, purportedly to offer oil and gas consulting services.

15. At all relevant times, Riley was the sole owner, officer, and employee of Calibre Consulting Group LLC ("Calibre"). Calibre is a Virginia limited liability corporation, registered with the Virginia State Corporation Commission as an investment advisor on or about December 17, 2014. As of March 30, 2022, Calibre reported $775,000 in assets under management for two clients.

## FACTS

### Background

16. As an investment adviser, Riley owed his advisory clients a fiduciary duty to act in their best interest, which includes an affirmative duty of utmost good faith to make and full and fair disclosure of all material facts.

17. A private placement involves the sale of securities directly to private investors rather than via a public offering on the open market.

18. Generally, a private placement memorandum is a document with information for prospective investors concerning securities offered for sale through a private placement. Such memoranda typically include information regarding the terms of the offering, the risks of the underlying investment, and the business plan and prospects of the entity whose securities are for sale.

19. Day trading is an investment strategy in which an investor opens an investment position hoping to exit the position the same day for a quick profit. This strategy generally involves a high degree of risk, with potential for significant losses because of the unpredictable short-term volatility of individual securities and the market as a whole.

### Overview of Riley's Investment Scheme

20. As described in more detail below, Riley solicited investments in his companies from investors and advisory clients throughout the Relevant Period. He communicated with them in person, over the phone, via text message, and via email. Riley also provided some individuals with written materials including private placement memoranda and sales presentations.

21. Riley obtained funds for investment from individuals, including Calibre advisory clients and his plumber.

22. These individuals bought Green Light and Mustang securities from Riley. They gave Riley funds to invest in Green Light and Mustang in order to benefit from the oil and gas projects these companies were supposedly pursuing. Riley's investors and clients thus expected profits through Riley's efforts on their behalf to bring oil and gas projects to fruition.

23. Riley pooled the funds he received in bank and brokerage accounts he controlled.

24. Unbeknownst to Riley's clients and investors—and contrary to what Riley represented to them—Riley was not using their money to pursue oil and gas projects. Rather, without their knowledge or permission, Riley used their funds for his own personal expenses, to day trade, and for other purposes Riley's investors and clients had not authorized.

25. Riley also misrepresented the status of his companies' purported projects both before and after he received funds for investment. When individuals inquired about the status of their investments, Riley responded to them by email and by text message, as well as on telephone calls and at in-person meetings. He variously assured them that projects were moving forward, provided them with excuses for project delays, or avoided contact with them.

26. Riley's explanations regarding project delays were false, because Riley had in fact never used investor or client funds for oil and gas projects.

### Riley's Fraudulent Sale of Green Light Securities

27. Riley sold Green Light securities during the Relevant Period to individuals, including his advisory clients and other investors.

28. For example, between January and February of 2014, Riley obtained funds for investment in Green Light from an advisory client of Calibre.

29. Riley obtained these funds by representing that Green Light would use the money to make a "strategic investment" in another energy company.

5

30. Riley provided the client with a Confidential Private Placement Memorandum (the "2014 PPM") describing Green Light's offering of "Senior Participating Notes." These notes were to mature on December 31, 2024, with an annualized interest rate of one percent until maturity.

31. According to the 2014 PPM, the Green Light notes guaranteed, on a quarterly basis, twenty percent of any net liquidity Green Light derived through its "strategic investment" until the principal amount was paid in full, after which the note would pay twelve-and-a-half percent per quarter. The 2014 PPM further stated that Green Light intended to use proceeds from the sale of the notes to invest in another entity in the energy industry (i.e., the "strategic investment").

32. Riley spoke to the client about the energy industry entity which Green Light intended to invest in with the proceeds of the note offering. Specifically, Riley represented that this entity was STW Resources Holding Corporation ("STW"). STW, now defunct, was a water remediation company traded via the over-the-counter market under the ticker symbol STW.

33. Based on Riley's representations, including those in the 2014 PPM, the client wired Riley approximately $100,000 in February 2014. Specifically, at Riley's direction, the client wired funds to a Bank of America account in the name of Green Light Energy LLC, ending in 4455 (the "Green Light Account").

34. Riley did not use these funds to invest in STW.

35. Instead, Riley transferred some of these funds to his personal checking account, a Citibank account ending in 6826, to pay his own expenses.

36. Riley transferred the balance of the funds to his brokerage account. He day traded with these funds, consuming the client's money through trading losses and brokerage commissions.

37. The client later inquired about the status of his investment in Green Light. In response, Riley told the client that the STW deal had fallen through.

38. After defrauding that Calibre client, Riley solicited more individuals to buy Green Light securities between in or about May 2014 and June 2018.

39. Riley contacted prospective investors during this period, including other Calibre advisory clients and his neighbors regarding investments in Green Light oil and gas projects.

40. Riley obtained over $335,000 from nine individuals who entrusted their funds to him to invest in oil and gas projects through the purchase of Green Light securities.

41. Riley obtained these funds by misrepresenting the status and prospects of Green Light's oil and gas projects, and the manner in which Riley would actually use the investors' money.

42. For example, in or about June 2017, Riley solicited a $24,500 investment from a Calibre advisory client under the pretense that Riley would use the funds to acquire an oil and gas lease in Texas. Riley deposited the client's check to the Green Light Account. However, Riley transferred nearly all of these funds to his personal brokerage account, leaving the Green Light Account overdrawn. Riley lost approximately half of this client's funds through day trading, using the balance to pay for personal expenses such as dining, entertainment, and mortgage payments.

43. In another instance, in or about February 2018, Riley emailed a prospective investor a sales presentation and private placement memorandum (the "2018 PPM") concerning a Green Light project to operate oil wells in Texas. The 2018 PPM stated, among other things, that proceeds of the private placement would be used to fund this oil well project. The accompanying sales presentation stated, among other things, that the project was in a "proven oil zone" which had produced over 1,000,000 barrels of crude oil.

44. This investor wired $20,000 to the Green Light Account on or about February 8, 2018. Riley transferred these funds to his brokerage account, then exhausted nearly all these funds through day trading losses and brokerage fees. Contrary to his representations to the investor that this project was moving forward, Riley in fact never used the investor's funds as promised or in a manner consistent with the 2018 PPM.

45. Riley occasionally made purported "interest" or "progress" payments to investors who had purchased Green Light securities. However, contrary to Riley's representations to these investors,

such payments were in most instances not funded by project revenue or profits.  Rather, such payments came substantially from funds Riley had obtained from other investors.

**Riley's Fraudulent Sale of Mustang Securities**

46. In or about April of 2019, Riley solicited an investor—who had worked for Riley as a plumber—regarding a purported oil and gas project with Mustang.

47. Via text message, Riley told the investor that the Mustang investment was "100x better than [a] bank account" and carried little or no risk of loss.

48. Based on these and other representations Riley made to him, the investor sent Riley a check for $40,000 for investment in Mustang's oil and gas project.

49. Riley deposited this check on or about May 3, 2019, into a Bank of America account ending in 0423.  He transferred $38,800 of these funds to his personal checking account, a Bank of America account ending in 4049, then transferred $38,530 of these funds to his brokerage account.

50. Riley later received a $5,000 investment in Mustang from another investor.

51. Of the approximately $45,000 Riley raised through Mustang, Riley lost over $14,000 through day trading.  He meanwhile used over $30,000 of these funds to pay for his personal expenses, including retail purchases and meals.

52. Individuals who had purchased Mustang securities asked Riley about the status of the Mustang project.  In response, Riley claimed the project was delayed due to COVID-19 because the pandemic had made it difficult for foreign investors to visit drilling sites.

53. Riley also made small purported interest payments to his Mustang investors.  Riley claimed these payments represented revenue from the project.  In fact, Riley made these payments in large part with funds he had obtained from other investors and clients.

**FIRST CLAIM FOR RELIEF**
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**

54. The Commission re-alleges and incorporates by reference paragraphs 1 through 53.

55. By engaging in the conduct described above, Riley, in connection with the purchase or sale of securities, directly or indirectly, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, knowingly or recklessly: (a) employed one or more devices, schemes, or artifices to defraud; (b) made one or more untrue statements of material fact or omitted to state one or more material facts in order to make the statements made, in light of the circumstances under which they were made, not misleading, or (c) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

56. Riley thus violated, and unless restrained and enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**SECOND CLAIM FOR RELIEF**
**Violations of Section 17(a) of the Securities Act**

57. The Commission re-alleges and incorporates by reference paragraphs 1 through 53.

58. By engaging in the conduct described above, Riley, in the offer or sale of securities, directly or indirectly, by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails (1) knowingly, recklessly, or negligently employed one or more devices, schemes, or artifices to defraud, (2) knowingly, recklessly, or negligently obtained money by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and (3) knowingly, recklessly, or negligently engaged in one or more transactions, practices or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

59. Riley thus violated, and unless restrained and enjoined will again violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## THIRD CLAIM FOR RELIEF
### Violations of Sections 206(1) and 206(2) of the Advisers Act

60. The Commission re-alleges and incorporates by reference paragraphs 1 through 53.

61. At all relevant times, Riley was an investment adviser within the meaning of Advisers Act Section 202(11) [15 U.S.C. § 80b-2(11)].

62. By engaging in the conduct described above, Riley, directly or indirectly, by use of the mails or means or instrumentalities of interstate commerce: (a) knowingly or recklessly employed one or more devices, schemes or artifices to defraud clients or prospective clients, and (b) knowingly, recklessly, or negligently engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon clients or prospective clients.

63. Riley thus violated, and unless restrained and enjoined will again violate, Sections 206(1) and (2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) & 80b-6(2)].

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

### I.

Permanently enjoining Riley from violating Section 17(a) of the Securities Act [15 U.S.C. §77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)], Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§80b-6(1) & 80b-6(2)].

### II.

Ordering Riley to disgorge all funds received, directly or indirectly, from his illegal conduct, together with prejudgment interest.

### III.

Ordering Riley to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)].

### IV.

Barring Riley from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Securities Act or of any issuer required to file reports pursuant to Section 15(d) of the Exchange Act, under Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] and Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)].

### V.

Granting such other and further relief as the Court may deem just and appropriate.

### JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, the Commission requests that this case be tried to a jury.

Respectfully submitted,

SECURITIES AND EXCHANGE COMMISSION

Dated: Mar. 1, 2023

By: */s/ Timothy K. Halloran*
Timothy K. Halloran (VSB No. 48352)
Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549-5985
Tel: (202) 551-4414
Fax: (202) 772-9292
Email: hallorant@sec.gov

Spencer Willig
Gregory R. Bockin
Brendan P. McGlynn
Christine R. O'Neil
Securities and Exchange Commission
1617 JFK Boulevard, Suite 520
Philadelphia, PA 19103
Tel: (215) 597-3100
Email: willigs@sec.gov

*Attorneys for Plaintiff*